OPINION OF THE COURT
 

 Wesley, J.
 

 On the particular facts of this case, we hold that respondent, Frito-Lay, Inc. did not violate Labor Law § 193, which prohibits an employer from making unauthorized deductions from wages, when it required its route salespeople to remit moneys collected from customers upon delivery of inventory, since these repayments to the company were unrelated to and independent from the payment of wages.
 

 I.
 

 Respondent Frito-Lay, Inc. manufactures and distributes snack foods. As part of its distribution process, it employs route salespeople who pick up the snack foods from the company’s wholesale distribution warehouses, deliver them to retailers, and collect payments from those stores on behalf.of the company. It is the form of these payments which lead to the dispute giving rise to this case.
 

 When a salesperson picks up the product each morning from the Frito-Lay warehouse, the amount taken and the cost is
 
 *345
 
 verified by both the salesperson and a warehouse employee. The salesperson then delivers the product to various retail markets, and collects payment from the retailer for the product delivered. For the most part, retailers pay the salespeople through either "charge tickets,” a form of credit, or checks written directly to Frito-Lay. However, those retailers that the company does not consider sufficiently credit-worthy are required to pay cash. At the end of each day, the salespeople mail all funds collected directly to the company. The company requires cash receipts to be converted into either checks or money orders, which are then mailed directly to Frito-Lay along with checks from retailers and charge tickets. The company reimburses employees for the costs of money orders; however, the checks forwarded by employees come directly from their personal checking accounts.
 

 Every 20 business days, the company issues an accounting report to each employee, detailing all the transactions for that period. The report shows any discrepancies between the amount of product taken by a salesperson, and the amount of money remitted to Frito-Lay. The salespeople are required to reimburse the company for any deficit shown on the report. However, pursuant to specific procedures enumerated in the company’s employment manual, Frito-Lay provides the employees an opportunity to demonstrate that the deficit is the result of such things as damaged or stale product, bounced checks, or third-party theft of either product or cash. Frito-Lay does not attempt to recoup those types of losses from its employees. Moreover, wages are paid regardless of any outstanding account deficiencies existing at the time of payment, although the company does impose other sanctions for the failure to make up account deficits.
 

 On June 9, 1989, the Commissioner of Labor issued an order to comply, charging that Frito-Lay’s practice violated Labor Law § 193. The order to comply covered 52 employees in the western New York area, including 10 employees represented by a Teamsters local.
 
 [1]
 
 The Commissioner sought repayment of $35,017.11 for a two-year period, plus 16% interest, and a $7,000 penalty.
 

 Frito-Lay requested and received a hearing before the Industrial Board of Appeals, which revoked the order. The
 
 *346
 
 Board ruled that the payments at issue were unrelated and independent from the payment of wages, and therefore did not violate Labor Law § 193. The Board specifically found that "[n]o part of the receipts collected by the salesmen were to be retained as compensation and their wages were fully and timely issued without regard to the status of any pending account balances.” Given the company’s policy of allowing setoffs for theft, spoilage, bounced checks and similar contingencies, and the failure of the Commissioner to provide any other explanation for the account discrepancies, the Board accepted Frito-Lay’s assertion that the failure of the employees to remit the full amounts collected was the main cause of account deficiencies.
 

 The Commissioner commenced a proceeding pursuant to CPLR article 78 to annul the Board’s determination. Supreme Court granted the petition, annulled the Board’s determination, and reinstated the Commissioner’s order to comply, holding that the practice of requiring route salespeople to turn over unremitted funds violated Labor Law § 193
 
 (Matter of Hudacs v Frito-Lay, Inc.,
 
 160 Misc 2d 131, 135). The court further rejected the company’s argument that Labor Law § 193 violated the National Labor Relations Act (NLRA), holding that the statute merely set a minimum labor standard which was not inconsistent with the NLRA (29 USC § 151
 
 et seq.; see, Metropolitan Life Ins. Co. v Massachusetts,
 
 471 US 724, 755).
 

 The Appellate Division reversed Supreme Court, holding that the Board’s interpretation of Labor Law § 193 was rational and that there was substantial evidence to support the Board’s determination that the payment of wages and repayment of account deficits were "unrelated and independent transactions” that did not fall within the statute’s proscription of deductions from wages by separate transactions
 
 (Matter of Hudacs v Frito-Lay, Inc.,
 
 214 AD2d 940, 942). The Appellate Division also upheld the Board’s conclusion that application of Labor Law § 193 in this case would result in an improper interference with the collective bargaining process, and thus would violate the NLRA. We granted leave to appeal, and now affirm the Appellate Division.
 

 II.
 

 Labor Law § 193 prohibits employers from making any deductions from wages, except as required by law or regula
 
 *347
 
 tion, or authorized by the employee for the employee’s benefit.
 
 [2]
 
 The statute traces its roots to former Labor Law §§ 195-197 (L 1921, ch 50). These sections collectively prohibited deductions from wages for the benefit of the employer and were designed primarily to ensure full and prompt payment of wages to employees
 
 (Greenwald v Chiarella,
 
 271 App Div 213). Deductions from wages which were not for the benefit of the employer, however, were allowed
 
 {see, Greenwald v Chiarella, supra
 
 [wage deductions for the benefit of union under closed shop agreement did not violate Labor Law];
 
 Rownd v New York State Guernsey Breeders’ Co-op.,
 
 194 Misc 701 [deduction from wages to purchase bond required by the employer did not violate the Labor Law prohibitions against deductions from wages for benefit of employer]).
 
 [3]
 

 When sections 195-197 were recodified in 1966, the Legislature expressly provided that no deductions were to be made from employee wages, other than those required by law or regulation, or specifically authorized by the employee for the employee’s benefit (L 1966, ch 548). As originally enacted in 1966, section 193 forbade only direct deductions from wages. The Commissioner of Labor, however, eventually interpreted
 
 *348
 
 the statute to preclude not only direct wage deductions, but repayments to the company by separate transaction as well. The Commissioner’s rationale was that the statute should not be interpreted to allow employers to do indirectly what they could not do directly (see, Mem in Support of L 1974, ch 160, 1974 NY Legis Ann, at 238-239). The Legislature stamped its imprimatur of approval on the Commissioner’s interpretation when it amended the statute in 1974 to explicitly forbid repayments by separate transaction
 
 (id).
 

 The Commissioner urges that the language of Labor Law § 193 clearly prohibits payments such as this to the employer. This argument has some appeal, for certainly the transfers in question are "separate transactions” which accomplish a goal which could not be accomplished through a direct wage deduction. However, while section 193 (2) on its face prohibits "any payment by separate transaction,” it is clear from the statutory context that "any payment” is actually meant to refer only to payments from wages. The payments at issue are not in any sense charges or deductions from wages; rather, these payments merely represent full remittance of company funds temporarily entrusted to the employee’s control, which the company has every right to expect will be fully remitted.
 

 It is this element of extended control over funds belonging to the company outside of a discrete workplace that distinguishes this case from that of more typical service workers such as supermarket cashiers or waiters, and our decision today should not be read as validating payback schemes aimed at such employees. For the most part, shortages in these latter cases result from change being incorrectly paid to customers or the mishandling of the employer’s funds. These workers do not place company funds in their own bank accounts and then reimburse their employers from those funds. But that is precisely what occurs, by necessity, with the Frito-Lay employees before us. Having accepted funds owed to the company and converted them to their own accounts, these employees must accept a concomitant obligation to make corresponding, coequal payments back to the company. To the extent that they initially fail to do so, the company has every right to expect that the employees will make up any account deficits at a later date.
 

 Moreover, the Commissioner’s position taken to its logical conclusion would invalidate not just the deficit payments at issue here, but also the initial remittance of funds collected by the route salespeople from Frito-Lay’s customers as well. In the absence of a clear legislative mandate, we decline to read
 
 *349
 
 the statute as requiring such an untenable result. The funds initially collected are in no sense wages, and their remittance to Frito-Lay does not constitute a repayment of wages to the company. Rather, the moneys initially collected clearly constitute funds belonging to Frito-Lay that the company properly anticipates will be fully remitted. Labor Law § 193 was not intended to allow employees to refuse to fully remit funds they collect from customers to the company. Thus, in our view, the Board’s interpretation of the statute is a rational one, consistent with its history and purpose, and should be upheld.
 

 It is of particular significance that Frito-Lay allows setoffs for all deficits not attributable to the failure to fully remit funds. Given this fact, the Board’s finding that most, if not all, shortfalls are attributable to a failure of the employee to remit the full amounts collected is supported by substantial evidence. Section 193 was intended to place the risk of loss for such things as damaged or spoiled merchandise on the employer rather than the employee
 
 (see,
 
 Mem in Support of L 1974, ch 160, 1974 NY Legis Ann, at 238). Frito-Lay’s remittance policy is faithful to this statutory purpose. Thus, under the unique factual circumstances presented here, we conclude that Frito-Lay’s remittance policy does not violate Labor Law § 193. Given our disposition of this issue, we do not reach the question of whether Labor Law § 193 conflicts with the NLRA.
 

 Accordingly, the order of the Appellate Division should be affirmed, with costs.
 

 Chief Judge Kaye and Judges Titone, Bellacosa, Smith, Levine and Ciparick concur.
 

 Order affirmed, with costs.
 

 [1]
 

 . While not directly relevant to our holding, it is worth noting that the collective bargaining agreement with the Teamsters places the burden of making up such deficits on its members.
 

 [2]
 

 . Section 193 provides that:
 

 "1. No employer shall make any deduction from the wages of an employee, except deductions which:
 

 "a. are made in accordance with the provisions of any law or any rule or regulation issued by any governmental agency; or "b. are expressly authorized in writing by the employee and are for the benefit of the employee * * *
 

 ”2. No employer shall make any charge against wages, or require an employee to make any payment by separate transaction unless such charge or payment is permitted as a deduction from wages under the provisions of subdivision one of this section.”
 

 [3]
 

 . Former section 197, the most direct precursor to current section 193, prohibited transfers of "future wages,” and with regard to employer setoffs, specifically prohibited only charges for "groceries, provisions or clothing.” This provision was obviously intended to outlaw the "company store” type of arrangement which was prevalent in some industries, notably the steel industry, in the nineteenth and early twentieth centuries. The abolition of this practice became a major concern of the early labor movement, and similar laws aimed at eliminating this practice were passed in a number of States
 
 (see,
 
 W Va Code § 21-5-5; Mass Gen Laws Annot, ch 149, § 148; NJ L 1896, ch 179; Pa Act of June 29, 1881, §§ 1-4;
 
 see generally,
 
 Casebeer,
 
 Aliquippa: the Company Town and Contested Power in the Construction of Law,
 
 43 Buff L Rev 617).